Good morning, Your Honors. May it please the Court, my name is Michael Livingston. I represent the plaintiffs in this case. This case is even more clear-cut than the last case. The government in this case has conjured up the specter of breathtaking, even a limitless expansion of liability as their first line of defense here. This rhetoric and hyperbole only clouds the complex issues before the Court. What I'd like to do in the few minutes that I have this morning is summarize the very solid and settled legal basis on which our claims against the government are grounded. First, an employer has a duty to supervise employees under Restatement Section 317. This is settled law in Hawaii. This is the duty of a master to control the conduct of a servant, the duty of an employer to control the conduct of an employee. The master-servant-employer-employee relationship is one of the genre of relationships that is given special status under the Restatement in Hawaii law. Well, not everything that an employee does. I mean, I'm currently employed for the U.S. government, but it doesn't supervise what I do when I'm attending the Boy Scout meeting or something. Well, that's correct. And the application of Section 317, which has been adopted and actually quoted in its entirety in numerous cases in Hawaii jurisprudence, is set out most clearly in the Wong Leong versus Hawaiian refinery, independent refinery case, which we've relied on heavily. And the Wong Leong, and I'm not going to go into that. I think it's briefed extensively. The Wong Leong case explains the rationale behind giving the employer-employee relationship this special relationship status that gives rise to a duty. Well, it wasn't just the relationship. It was the fact that the individual there, whose name I haven't forgotten, wasn't drinking on the job, but was drinking in an accessory to the job. And the Court makes the point that the social functions were initiated by the company. The company maintenance shop built a cooler at the beginning. The beer or whatever else they were drinking was supplied by the company. After a while, the company stopped, and the contractors started supplying it. The company supplied the food. But it was kind of an accessory morale-building function being sponsored by the company. The fact that it was an employee by itself wouldn't have been enough, because that would suggest the KFC case, where you had employees on company premises with the company's knowledge, the Court would have found liability, and it didn't. So it's more than just the employee status that causes the finding of liability. Absolutely. And Wong Leong makes that clear. There has to be a, well, let me just quote from the decision. I think it's most clear there. An employer can or should know of the necessity and opportunity for exercising such reasonable control over its employees as to avoid the foreseeable risk that an inebriated employee will injure a third party in a motor vehicle accident where the employer is on actual notice that pursuant to traditions or practices that they themselves have instituted or condoned, their employees are systematically and consistently consuming alcohol on company premises after working hours, albeit outside the scope of their employment. And that's precisely what we have here. There is no question that Jason Hilliard was an employee of the government and was drinking on government premises at the time that he got drunk and then left the premises and drove his vehicle into my client's vehicle, killing her. I would refer the Court to the case of Lutz v. United States. This is a 1982 decision by the Ninth Circuit. This was the dog mauling case that took place on an Air Force base. And in that case, the Ninth Circuit said this, quote, military housing presents a unique situation. Unlike employees and residents of cities and islands, the employment relationship of residents of military bases continues even during the off-duty, at-home hours, end quote. We've also referred the Court to the provisions within Regulation AR-600-85, which requires, and I quote, that there be a continuous command presence in installation, living, work and recreational areas to reduce alcohol and other drug use. So there's still the extra. In the case of Lutz, the Court makes the point that not every act on premises is within the scope of employment. But in that case, they found sufficient basis for saying there were regulations or directives issued with regard to control of dog, and the owner of the dog at that time was trimming his brass or something that he was supposed to do. The one we emphasize is condone, and that may be where we have to focus some degree of attention. Could we fairly say, does the evidence support the case to survive summary judgment, that the government here sufficiently condoned the activity that Hilliard was involved in, so that the government becomes responsible for the consequences of that activity? Well, that is, in fact, exactly the inquiry that needs to be made, with all the deference that should be given to the respondents on a motion for summary judgment. And I submit that the record here has overwhelming support that the government condoned. Not all levels of command condoned, but it doesn't need to be. Everyone, every employee of the government that condones simply needs to be that there is a practice that is condoned. And here, the record certainly supports that. And I'd refer you specifically to the declaration of Paul Gamache, which very clearly sets forth a basis for that conclusion. May I ask you just one question, so I'm clear about what issues we're dealing with? The Long-Leone case has a Port A and a Port B. And the Port A is the sort of traditional general respondeat superior, and the Port B is an alternative argument, that even if he's not acting within the scope of his employment, they may be held liable for failing to control him, or to control the conduct of the employee. Are you raising both the issues in Port A and B, or just Port B? Just Port B, Your Honor, although perhaps in retrospect we should have raised the respondeat superior. Yes, I read the Port A, and I didn't understand why, because your argument seemed to be as I had the impression that you were not raising it. Well, we haven't raised that. Well, it's a little late. It is a little late, but we don't need to raise it. There are no fewer than four separate and independently sufficient legal bases for the claims that we've asserted against the government. That would arguably present a fit. All right. Well, that's fine. That should make it easier for me to follow up on the issues. All right. I want to move through these relatively quickly because of the limited time. The second independently sufficient basis for a claim is Section 319 of the Restatement. This is the duty of a custodian to protect the public against dangers posed by a ward. And again, this is a claim that has been adopted by the Hawaii Supreme Court very explicitly in a number of cases going back as far as the 1978 case of Adjiroji versus the state. The following year in the Seibel versus Hittian County of Honolulu case, the court analyzed Section 319 at some length. And in that case, it actually set forth the rationale for finding that the custodian-ward relationship is another of these relationships that deserves special status. And the court there stated that the parent, master, or institutional custodian who has de facto or de jure custody or control over the child, servant, or ward should be able to foresee the risk created by the other and can or should be able to take precautions against the risk. Now, here, Hilliard definitely was in custody and under control of the government on the night of February 19th. I would refer the court to the Ninth Circuit decision in Kearney versus the United States. This was a case in which the government was alleged to have been negligent, quote, in failing to supervise properly a prisoner confined to barracks, end quote. That is precisely what we had here, a prisoner confined to barracks. In Kearney, though, the court described that prisoner as being, I think the phrase was known predator. And the sense was he was being confined because he wasn't to be exposed to the outside world at least while the rape charges were pending. In this case, you've got somebody who's confined but for a pretty limited period in a confinement that isn't far from a house arrest. I mean, there doesn't seem to be any serious supervision being imposed upon him. He's just supposed to stay on the base and stay in the barracks. Well, in fact, there wasn't any serious supervision. The question is whether there should have been. And I submit that the nature of the confinement was no different in Kearney, although the purpose may have been different. But the confinement to barracks in Kearney, if you look at the ease with which he circumvented that confinement, is very similar to the level of custody that is at issue here. And in Kearney, of course, the court explicitly characterized that as a prisoner in custody. And Kearney is interesting for another reason. In Kearney, the Ninth Circuit observed that courts impose, and I'm quoting here, courts impose liability upon the government for those battles committed by persons under government control who are negligently supervised or controlled, such as patients, citations, prisoners, citations, and in rare cases, employees known to be dangerous, citations. We have here all three categories. We have a patient, a prisoner, and an employee known to be dangerous, all wrapped up in one package, Jason Hilliard. Again, the facts of this case fit squarely within Section 319. Well, he's known to be dangerous. He's known to be an alcoholic. Correct. And he was known to be regularly operating his vehicle. And under Hawaii law and under, I believe, the common sense, he posed a danger to the public. And I'm going to address foreseeability. Of course, the government has relied very heavily on an argument that we haven't shown foreseeability. But I want to, again, move very quickly through the last two pillars that support our claims. The government had a duty to follow its own administrative rules using reasonable care. There is a very recent Hawaii Supreme Court case almost directly on point. That's Sue, T-S-E-U, X-Rel Hobbs v. Jett, J-E-Y-T-E. This is the case in which there was a counterclaim against the Hawaii Civil Rights Commission. And the Hawaii Supreme Court said this, quote, the Hawaii Civil Rights Commission is subject to a duty to follow its own administrative rules utilizing reasonable care, end quote. And in denying a motion for reconsideration, it repeated that same statement, quote, the cause of action which may exist against the HCRC is based upon a duty to follow its own administrative regulations. And then it went on to say this is not a novel cause of action, end quote. Very recent case, Doe Parents v. State of Hawaii, cites to the Sue case with favor and also cites to the and discussed Miller v. Yoshimoto case, a 1975 Hawaii Supreme Court case, where the court grounded the duty of care that the Department of Education owed to the plaintiffs in the Department of Education's policies and regulations. Counsel, when you're through, any cases you've cited that are not in your brief, will you give the citations to the court as well as your opponent? All of these citations are in the brief. The Doe Parents case was actually decided in November of 2002, about a week before our reply brief was due. Although we reference it in there, we give the Westlaw site, and it's not treated with the extent it deserves. That's the one you gave us the 28-day letter on? Correct. The Doe Parents case also cites and discusses the Sheraton v. United States case. This is the United States Supreme Court case where the court held that by voluntarily adopting regulations, the government assumed responsibility to perform its good Samaritan tasks mandated by the regulation in a careful manner. And then about a year later, the Ninth Circuit weighed in, in Doggett v. United States, a case very similar on its facts to this case. And in a two-judge concurrence, majority concurrence authored by Judge Reinhart, the court applied Sheraton to find that the adoption of a regulation established a duty to perform the good Samaritan task embodied and mandated by that regulation in a reasonable, in a careful manner. And the Ninth Circuit majority concurrence went on to state, quote, if the petty officers on whom the regulation imposed the duty were or should have been aware that Gorman was intoxicated and negligently failed to provide care for him as required by the regulation, the government would be liable, end quote. We have alleged and provided substantial competent evidence to support claims that the government failed to follow its own mandatory regulations in numerous respects. Finally, the fourth independently sufficient basis for our claims, where the government engages in affirmative conduct that increases the danger to the public that has a duty to take precautions against that danger. The best case in Hawaii on this is Faulkman, F-O-C-H-T-M-A-N, versus Honolulu Police and Fire Departments. This is a case which is illuminating because it demonstrates the expansive nature of the Hawaii court's interpretation of this cause of action. Here we have alleged numerous affirmative acts. Placing and maintaining an underage soldier in barracks permeated with alcohol, where there was a culture of alcohol. Providing inadequate care under a voluntarily enacted regulation. Inadequate medical care. Confining Hilliard to barracks where the confinement may very well have precluded his receipt of mandatory necessary medical care. And permitting Hilliard to operate an uninsured motor vehicle in violation of the regulations. Now I want to turn to this issue of foreseeability. Government begins its brief, its answering brief, by contending that we have not raised a genuine issue on foreseeability. The ability, of course, is the prototypical question for the trier of fact. And the Doe-Parents case reaffirms that well-settled proposition. The government is attempting to squeeze its defense into the Adjuroji case, which turned on a determination of foreseeability. And Adjuroji held that there was no competent evidence of foreseeability and specifically said there was no expert testimony on foreseeability. And not surprisingly, we have echoed in the government's answering brief a statement that, and this is repeated in their answering brief on several occasions, that we have not provided any expert testimony to support a finding of foreseeability. This is simply not true. I don't have time this morning to quote from Dr. Tremblay's expert report. I would encourage you to study that report. It's lengthy. It's detailed. It's from one of the foremost experts on alcohol addiction and treatment in the country. And it includes very specific analyses of the issue of foreseeability. I'd refer you specifically to pages 508 and 510 of the excerpts of the record. Second, the government seeks to avoid a finding of foreseeability by hiding behind its own negligence. On the first page of its answering brief, the government states, quote, no agent of the employer saw the employee drunk on the day of the accident, end quote. Again, that's simply not true. Paul Gamache, an agent of the employer, drank with Hilliard, got drunk with Hilliard, left the facility with Hilliard and was in the vehicle with Hilliard when it slammed into Alex's car. But leaving that aside, it is beyond dispute that if the government had properly monitored Hilliard's confinement to barracks on the night of February 19th, it would have seen him drinking in the barracks, it would have seen him drunk in the barracks, and it would have seen him drunk as he staggered past the CQ desk on the way to his Firebird, which is parked conveniently in the parking lot right outside the barracks. Moral, our expert has opined that the reason the government did not identify the very real and extreme risk that Hilliard would drive drunk is that it was negligent in obtaining and processing the information on which an assessment of Hilliard's risk reasonably could be made. The clinicians never asked the basic and mandatory question, are you operating a vehicle? Do you own a vehicle? And Hilliard's command was never given the information about the nature and extent of his alcohol problem or his acquisition and operation of his motor vehicle. The evidence of Hilliard's alcohol consumption is mind-boggling. Less than a month before the accident, the medical records contain numerous entries showing incredible consumption of alcohol. Quote, he typically has consumed one-fifth of Jack Daniels a day, seven-fifths J.D. a week, one-fifth of Jack Daniels daily for a two-year period. These are three separate entries in the medical record less than a month before the accident. And this information is strongly corroborated by other evidence. He had elevated liver enzymes. His liver functions in a 19-year-old young man, his liver functions were off. He was determined to be alcohol dependent with a score of 13 out of 15 on a test where five is alcohol dependent. He told his clinicians on February 6th, two weeks before the accident, that he couldn't maintain sobriety, particularly in a barracks environment. He complained of withdrawal symptoms. He complained of insomnia, that he was sleeping two to three hours a night. He complained that he was drinking 18 cups of coffee a day. The evidence of the extent and nature of his alcohol problem is overwhelming, and there's evidence that his command knew that he had an extreme problem with alcohol, although they didn't know the specifics because there was not the communication that was mandated under the regulations. Any thinking, responsible government employee who knew the nature and extent of Hilliard's alcohol addiction and knew he was regularly operating the Pontiac Firebird would have concluded that it was not only probable that he would drive drunk, it was inevitable. It was inevitable. And if you narrow the focus to February 19th, is there any doubt that the risk posed by Hilliard would have been immediately obvious if they had seen him drunk drinking in the barracks, as they should have, or if they'd seen him stagger past the CQ desk drunk, as they should have, and get into his Firebird and drive off? Okay, so your time has expired. We'll give you a few minutes to wrap up. Thank you, Your Honor. Thank you, Your Honor. Excuse the Court. Thomas A. Helper on behalf of the defendants. I do want to start with foreseeability because I do think that's the cleanest resolution of this case. What we knew about Mr. Hilliard was that he was drunk, that he had a car. That's it. That's the material facts that we knew. I don't think it's supported in the record that we knew he was operating the car. There's certainly a citation that we knew he was parking the car in our parking lot, but the regularly operating portion of it is not supported in the record, as far as I can tell. Somebody knew the car was recently acquired. Yes, sir. And he was buying it or paying for it over time, so he hadn't gotten the registration yet and couldn't get insurance. Right. The fact that he didn't have a past history of driving doesn't tell you anything. He didn't used to have a car, but now he does. Well, I think it has. I mean, certainly he doesn't have a past history of drunk driving is one important aspect. But certainly— He certainly didn't have much of a history of driving. He didn't have a car to begin with. I don't think it's clear in the record. Aren't we supposed to draw the inferences in favor of the non-moving party? Isn't it an inference that somebody who bought a car and was parking it on the base was going to drive it? No, I don't think so in this case, Your Honor, because he's told—I mean, I think unlike the libelous favorable of the plaintiff, he's told them, I don't have insurance. I don't have—it's not registered. And the sergeant says, get that taken care of in the next—before the next inspection. Get it taken care of. And there's no discussion in the record of any information being transmitted to the sergeant about, I'm going to drive it or— Do you take the answer that you would infer that he might have gotten the registration? Then that might be one inference you could draw, right? I mean, we knew— Well, this could be more of a problem with the car. But for some of the judgment, somebody even taking the admission that he bought a car, he didn't have it registered initially. He was told to go get it registered. You would assume he would do that because he bought the car because he wants to drive it. I'll accept that. I think that's right. But I think the Henderson case that we cited in our supplemental letter is dispositive on this issue. In the Henderson case, the employer took his employee to Kauai, provided him a place to stay, gave him the keys to a company car, knowing that the employee was going to go out drinking, was going to drink at a party, and the Hawaii Supreme Court still said it was not foreseeable that drunk driving would be the result of that. They said that— Not everybody who goes out drinking at a party gets drunk. Not everybody who goes out to a party— Well, they also— —and drinks their share of alcohol gets drunk. The employer further knew that the employee was a very heavy drinker. There was some discussion about whether there was really an evidentiary foundation laid, proper evidentiary foundation laid for the fact that this guy was a heavy drinker. But then the Hawaii Supreme Court in the Henderson case moved on and assumed that even if there had been a proper foundation laid, even assuming that the employer knew that the guy was a heavy drinker or an alcoholic, there was no showing that once he was drunk that he behaved in a reckless or irresponsible manner. And so even the mere knowledge that someone has access to a car, will be driving a car, is an alcoholic, is not sufficient under self-employed law to establish foreseeability. Well, an interesting fact about this is that in the ordinary course, you don't need your employer's permission to drive a car. And here, before anyone can drive a car or operate a car on a base, you do have to get the permission of the installation commander, right? No, I don't think that is right. I think that's— Well, what about this driving privileges? It says driving a government vehicle or a privately owned vehicle on a military installation is a privilege granted by the installation commander. It's a privilege, but that doesn't mean— Granted by—granted. In other words, you have to get permission to drive on a military vehicle. But there are procedures for getting permission. And I think—and there's no set procedures for—at Schofield Barracks at this time, there's no showing that the sergeant in question violated any particular procedures in doing— No, no, that's not the point of my question. My point is that in differentiating this situation from that of the normal employer, the normal private employer, you don't have to usually ask your employer for permission to drive a car. Well, but—and I think that's actually a place where this is on point with Henderson & Henderson. They gave him the keys. Yeah. So I think that that's a similarity. I think that giving somebody the keys is a more— knowing they're going to a party is a more extreme or more affirmative act than simply not confiscating the guy's car. Yes, well, I take your point on that in terms of affirmative acts, but I guess I was talking about the general—the overall scope of control over driving is much greater on a military base, you'd have to concede, than in a normal employment situation. Right, but I think that's—I mean, a normal employer does have some degree of control. I mean, if the owner of McDonald's can say, you can't park your car at my lot, you're working here, but your car is not registered. I mean, an employer has that power in other situations. It's explicitly written here. But any owner of property has power to exclude drivers, parkers, et cetera. I don't think the fact that we put it down explicitly in a regulation or a policy statement makes it all that different from the normal course. In Henderson, they said there was no evidence that McLean was ever involved in any drunk driving incidents or exhibited drunken or negligent behavior of any kind at any time on or off the job. Right. Well, that's not the same as this case, is it? I think it is. This—here we have no knowledge of drunken conduct, drunken behavior on or off the job? Drunken—I think we knew he was drunk. I don't think we knew he ever acted recklessly. Well, no, it said, or exhibited drunken or negligent behavior of any kind at any time on or off the job. They seem to rely very heavily on the fact that the evidence is not sufficient to really believe that this person is the kind of person who would be a drunk who would drive. But I would think that there was evidence in this record that he had engaged in drunken behavior. I think there's evidence in Henderson clearly that he engaged in drunken behavior. I mean, they assume that he's— Well, there may be. All I'm saying is the Court said there wasn't. I think it's—I think if you read that in context, Your Honor, I think what they're saying is this recklessness. If you look at the last sentence of that paragraph, any other fact which may have supported Henderson's assertion that felt new or should have known that McLean was prone to act unreasonably or irresponsibly, I think this— Are you saying basically you're trying to draw a distinction between a responsible drunk and an irresponsible drunk? That's exactly what the Court does. I mean, when you're consuming a document, the quantity of— basically is your argument that if someone's consuming a fifth of Jack Daniels a day, that that person can be deemed responsible? Under Henderson, that's exactly what it says. I think you're—I think you may be right. They are saying there are responsible drunks and irresponsible drunks. That's right. And one question would be whether this drunk, 19-year-old drunk who just bought a car, who couldn't control his alcoholism, who said he was incapable of not drinking, whether you might consider him to be an irresponsible drunk? Whether there would be an issue of fact as to whether he would be classified as an irresponsible drunk. I think that there has to be some specific evidence of— under Henderson, there has to be some specific knowledge on the part of the employer, the supervisor, of reckless behavior. The dog has to bite once before you're going to suspect he'll bite again. Well, essentially, yeah, that he has to do something. I mean, Mr. Hilliard himself said, and it's undisputed in the record, I never drove drunk before this incident. It's on the record at page ER 171. This was his first fight, and it was certainly a tragic result. Well, we don't know that it really was his first fight. We know he was never caught before and that he says he didn't drive drunk before. I think the important point here is that there was no notice to the employer of irresponsible behavior, of drunk driving or anything else along those lines. I want to turn next to the McKenzie case, which I think disposes of the great majority of plaintiff's claims. This is the recent Hawaii Supreme Court case on physician liability to third parties injured in automobile accidents. And in the reply brief, the plaintiffs sort of skated by it and didn't mention it at all in their argument, but I think it really disposes of all their claims against the doctors in this case. And if you look at the allegations and the complaints and in the briefs, most of the allegations that they've got here concern decisions made by the doctors. What treatment should we give them? Should we hold off on treating him while he's confined to barracks? Should it be overnight stay? Should it be some other kind of treatment that is prescribed for him? All those are explicitly rejected by the pretty sweeping nature of the McKenzie decision. I would just direct the Court's attention to it. I don't think there's much more to say about it. To address this contention that regulations can create a duty, I don't think that's right. The plaintiffs in their opening brief relied on restatement section 286. It's that explicitly for the proposition that a regulation can create a duty. That regulation explicitly says that a standard of conduct, not a duty, can be created by a regulation in certain circumstances. And I think also in their opening brief the plaintiffs said this is not an issue that's ever been addressed by white law. And I think they changed course a little bit to cite the Lee case in support of their contention that a regulation actually can create a duty, not just a standard of conduct. I don't think that's right. If you look at the Lee case, the Hwaii Supreme Court uses the term duty of care. And I think they use it interchangeably with the term standard of conduct. And I think that's the way the Hwaii Supreme Court has typically used that phrase, duty of care. So it's not a duty. I have to admit I think that the Hwaii Supreme Court is less than precise in its use of the term. But as I read it, I think it's like this. I have a duty when I go out driving to drive responsibly. And if you look at the law, the law says I've got to drive 55 miles an hour on the freeway. I think the Hwaii Supreme Court would say I have a duty of care to drive 55. But that doesn't mean that the 55-mile-an-hour speed limit creates a duty. The duty is something external. It's a policy decision. And I think the Hwaii Supreme Court has made that clear in a lot of its decisions. When it uses the term duty of care, it tends to be talking about either standard of care alone or standard of care, a duty to observe a particular standard of care. And I think that the Hwaii Supreme Court actually says that in the Doe case, which plaintiffs decided they distinguish. In the end, they criticized the trial court for laying out a list of obligations that the school district had and for calling them duties and said, well, they're not really duties. There's a general duty, and then these are specific obligations once you have that duty. So I don't think that regulations by themselves are going to create a standard, I'm sorry, a duty to take any particular action. Even if you assume that the plaintiffs are right in the phrase in the Lee case, in other words, duty of care means simply duty. If you look at the Lee case at page 343, they talk about when does a statute or a regulation create a duty of care. And they have sort of a checklist. First of all, does it create criminal liability? Does it explicitly create civil liability? Is it penal in nature or does it prescribe conduct, proscribe? No. Here, I think the regulation that the plaintiffs are talking about, both the medical regulation and the vehicle regulations, do not meet the criteria set forth in the Lee case for when a regulation creates a duty of care. In addition, under this court's precedent, the only time you start to look at a regulation is when that, when you're looking at a governmental entity that normally, of course, under the Federal Court Claims Act, the United States is held to the same conduct as a private party. Where there's a function that is a purely governmental function, this court has reasonably held that you can't just look at a private party standard of conduct. You have to look elsewhere. You have to look at the duties applicable to other governmental entities. In California, there's a specific regulation that says cities have to follow their own regulations. Those regulations create duty. There's no equivalent statement in Hawaii, and the Hawaii Supreme Court has never imposed a duty on any entity based purely on a regulation or a standard expressed in the law. The Wong-Leon case. Condoned means something other than what plaintiffs are calling it. Well, it's also the second circuit. I assume you would disagree with its view where it talks about drinking by servicemen can be viewed as important to military morale, just as drinking was apparently instrumental to good employee morale and customer relations in other cases. And then they say that drinking on base during off-duty hours is commonplace, if not an officially condoned activity. It certainly was a customary incident of the servicemen's employment relationship with the Navy. Sorry, which case was that, Your Honor? This is a paper case from the second circuit. Okay. I'm not familiar with that case, but. But the second circuit adopts a view of drinking on military bases,  it goes on, and there are risks with it, which the military must accept. We haven't adopted that view here, and Hawaii hasn't. But I want to suggest to you that there is more to the interpretation of condoned than the normal term, or at least some courts view it that way. Well, I think you have to look at the specific facts of Wong Leong to see what the Hawaii Supreme Court meant by condoned, and they really went down quite a list of activities or actions by the lawyer to condone. Judge Thomas went through a list of things that the employer did to condone it. Here, if we're talking about our relationship with Jason Hilliard, which I think is all that, I mean, the larger universe of enlisted men who are of age drinking, I think there potentially are very significant policy discretionary function concerns talking about what you're going to do with enlisted men of age drinking in the barracks and how you control that. I don't think we've gotten there in this case. I don't think we have to get there, because with respect to Private Hilliard, we took vigorous action to try to control his drinking. We arrested him. We warned him. We counseled him. We confined him to his quarters. We didn't condone his drinking. I think if the employee in Wong Leong, an employer, had taken any of those actions against the employee, there would have been a very different result. It could be said that the government did not condone his drinking in particular, particularly because he was underage, but that the environment in which he was placed, where most of the other soldiers were not minors, was an environment where drinking was part of the way of life. And they talked about having a roommate who was old enough, so they just described the stuff as being logging to the roommate. Couldn't it be said that whereas the government doesn't condone underage drinking, the proposition of drinking generally is not one that is discouraged, and if it's not discouraged, then it's not so far away from the Wong Leong facts where the company had stopped providing the booze itself, but let the contractors provide the booze, and in the end the company was held liable for it. I understand it's a reach, but... Well, I think if you ask Secretary Rumsfeld, is there a lot of drinking in the barracks? I mean, it's not in this record, but... I'm certain he would have a terrifying response that acknowledges the fact. Right. Well, at some level, is that sufficiently similar to Wong Leong? No. Well, there's two key distinctions here. One is drinking in the barracks is not the same as drinking in the parking lot. I think that's the most crucial distinction, is that if we're having a field exercise someplace where our men have to drive home afterwards and we provide booze in the parking lot or they bring their own booze in the parking lot, that's Wong Leong, where they have to drive home afterwards. These guys are in their houses. I don't think that there's any reasonable way to draw the line. I mean, that's approaching strict liability once you say that if an enlisted man gets drunk in the barracks, the government's on the hook for whatever he does afterwards because we know enlisted men get drunk in the barracks. That's where the Second Circuit seems to be, in effect. They say if they get drunk and you let them off the base, you take your chances. Now, our court has not gone down that line. I'm not suggesting we do, but Judge Reinhart's question begins to say, okay, we're under Hawaii law here. Is Hawaii expressing an attitude somewhat like that in the context of Wong Leong, where the company knows the drinking's going on, is no longer providing the alcohol, but knows it's there, and the guy drives off, and that's being viewed within – in fact, that's even within the scope of employment. It's not just negligence of probation. Well, I'm not familiar with the Second Circuit case, and I'd really like to explore the reasoning a little bit more at some point, but it sounds badly reasoned the way it's been described right now if you're going to – Well, Judge Calabresi was my torts professor, so it sounded just like a lecture that I heard some years ago. Anybody have a bad day? Briefly, on the Good Samaritan liability, Hawaii's Supreme Court has explicitly rejected that. In the Chichette case, they cite the Pamela L. case from California, and they – which – and the California case stated, a person should not be liable for nonfeasance in failing to act as a Good Samaritan, and the court explicitly adopted that language in page 356.  Well, thank you very much. I appreciate an opportunity to just respond briefly. The Henderson case was one in which the court first dismissed the claim on the basis that the entrustment, the alleged negligent entrustment, was not to the driver, but to his buddy, who then entrusted to him. But the court then went on to address a second question, and the question was whether Phelps knew or should have known at the time he loaned the vehicle to McLean that McLean would act unreasonably by loaning the vehicle to persons such as Hughes, who in turn would negligently operate the vehicle and cause injury to others. And the majority of the court then analyzed the evidence submitted by the plaintiff to prove the plaintiff's contention and concluded that there was no competent evidence that – to support this blatant assertion. That's a quote. Quote, no competent evidence to support this blatant assertion. End quote. They found there was no evidence in the record. And this was a very closely divided court. It was a three-to-two decision. And interestingly, in Wong-Leong, in the first Part A, which was the respondeat superior analysis, the Wong-Leong court, quote, discusses Henderson extensively. And yet in Part B, there's only one reference to Henderson, and it's in a footnote which is sandwiched into a part of the Wong-Leong decision, which concludes that there's an issue of foreseeability. And Wong-Leong was, of course, a unanimous decision. The government has suggested that there was no evidence in the record that Hilliard was operating his vehicle regularly. There is such evidence. I'd refer you, for example, to Gamache's declaration, Paragraph 8, where he states that, you know, it was common knowledge that he had the Pontiac. And, quote, Jason Hilliard drove the vehicle frequently and parked the vehicle in the parking area immediately outside the residential barracks, which also housed the company headquarters offices. And he goes on to say, it's inconceivable to me that they wouldn't know that he was operating the vehicle. And the McKinsey case. The McKinsey case dealt with a garden variety medical negligence claim. We have not appealed from the dismissal of our common law medical negligence claim. At pages 13, 14 of our reply brief, we deal with this argument. And I won't repeat those arguments here. But where the duty is found elsewhere, the case is not dispositive. For the administrative regulation, we rely principally on the Sue case, Sue X. Rel. Hobbs. That case seems very clearly and explicitly to find that there is a duty to follow mandatory regulations with reasonable care. Mr. Helper suggested that the government went to great lengths to protect against Hilliard's the danger that Hilliard posed. He said they arrested him. They counseled him. They confined him. The problem is that they did all of those things incompetently, negligently. And if they hadn't, we wouldn't be here today. There's no question that the government shares substantial blame for Alexis' death. Hawaii law provides four independently sufficient bases to turn that blame into liability. We ask that you reverse the district court and remand this case for trial. Thank you. Thank you both very much. The case case argument will be submitted and the court will take a brief recess. Thank you.
judges: Reinhardt, Thomas, Clifton